RAMONA RAMOS, demandante y apelada, *v.* THE MAYAGÜEZ SHIPPING TERMINAL, INC., demandada y apelante.

Núm. 7119.—*Sometido:* Febrero 5, 1937. *Resuelto:* Noviembre 3, 1937.

*J. Alemañy Sosa,* abogado de la apelante; *Enrique Báez García,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON emitió la opinión del tribunal.

Como once meses antes del accidente que dió origen a este pleito, la demandada había construído un puente sobre una pequeña ensenada o caño en las cercanías de su muelle. El puente había sido derrumbado por las crecientes de aguas resultantes de lluvias torrenciales, y un automóvil en que viajaba la demandante mientras se dirigía al muelle una noche obscura, cayó en el caño en el lugar donde anteriormente había existido el puente.

Los primeros cinco señalamientos son que la corte de distrito erró: al resolver que tanto el puente como la carretera que llega hasta el muelle eran de la exclusiva pertenencia de la demandada; al resolver que el terreno comprado por la demandada a Luisa Delgado está en la zona

arrendada por ella al Pueblo de Puerto Rico; al resolver que la carretera construída en el terreno comprado por la demandada a Luisa Delgado era el camino que la demandada se obligó a mantener en toda la zona arrendada para establecer comunicación con el litoral; al resolver que la intervención del alcalde de Mayagüez, Juan Rullán, en la compra del terreno efectuada por la demandada a Luisa Delgado, fué meramente ''accidental'', sin carácter oficial alguno, con el fin de cumplir súplicas amistosas; al resolver que el hecho de que tanto el puente como la carretera estuvieran abiertos al tránsito público, no creó responsabilidad alguna ni al Gobierno Insular ni al Municipio de Mayagüez.

El arrendamiento fué hecho por el Comisionado del Interior de acuerdo con ''una ordenanza autorizando a Félix Benítez Rexach a construir, mantener y explotar un malecón de servicio público, almacenes y todos sus anexos, en el puerto de Mayagüez, Puerto Rico, en aquella parte de la bahía que se encuentra entre 'La Puntilla' y el arrecife del 'Algarrobo'.'' El terreno descrito en el contrato de arrendamiento formaba parte de la faja conocida como zona marítima. La séptima cláusula del contrato de arrendamiento lee como sigue:

''SÉPTIMA: Se mantendrá por la arrendataria, en toda la zona arrendada un camino afirmado de no menos de seis metros de ancho, para establecer comunicación del litoral, pudiendo la arrendataria sustituir este camino por la calle marginal que para desenvolvimiento de los muelles construya, siempre que se llene el fin de dar paso por una zona pública por el litoral.''

En 1929 (Leyes de ese año, (1) pág. 411) la Legislatura adoptó una resolución conjunta (núm. 19) ''Ordenando al Comisionado del Interior la construcción de un trozo de carretera que una la carretera Núm. 2 con la calle 'Concordia' del Municipio de Mayagüez; destinando fondos para su construcción con la concurrencia de la mitad de los gastos por donantes particulares y por el municipio, y para otros fines.'' La Mayagüez Shipping Terminal adquirió enton-

ces una faja de terreno para una carretera que, partiendo del trozo autorizado por la resolución conjunta, condujera al lugar donde el puente sería construído. Hubo prueba testifical tendiente a demostrar que mientras se construía el trozo de carretera autorizado por la resolución conjunta, un ramal partiendo del referido trozo hasta un punto a unos cinco metros de distancia del lugar del puente, fué también construído bajo la dirección del gobierno en una faja de terreno adquirida por la Mayagüez Shipping Terminal de Luisa Delgado. Los autos no demuestran en qué forma se sufragó el costo de la construcción de dicho ramal.

La Mayagüez Shipping Terminal construyó entonces el puente y la carretera que está entre el puente y el malecón. Desviándose de la carretera mencionada en el contrato, en o cerca del punto donde el puente fué construído, la Mayagüez Shipping Terminal eliminó una curva pronunciada y peligrosa. Aparentemente el puente y el trozo de carretera que lo unía con el otro ramal autorizado por la resolución conjunta, fueron sustituídos con parte de la carretera que se requería de la Mayagüez Shipping Terminal construyera y mantuviera sobre aquella sección de la zona marítima descrita en el contrato de arrendamiento. Evidentemente este abandono de parte de la ruta mencionada en el contrato de arrendamiento y la sustitución de la nueva carretera tuvo lugar con el consentimiento y aprobación implícitos del Comisionado del Interior, quien revisó la construcción de ese trozo de la carretera que conducía desde un punto cerca del puente a la sección de carretera autorizada por la resolución conjunta. Ora el costo de construir esta parte de la carretera fuera pagado por la Mayagüez Shipping Terminal o no, ella fué construída sobre terrenos adquiridos para dicho fin por la Mayagüez Shipping Terminal para ser usados en conexión con el puente y con el ramal que estaba entre el puente y el muelle, primordialmente como vía de ingreso y egreso y como eslabón entre el muelle y la parte baja del distrito comercial de Mayagüez. Aunque este ramal fué abierto al

público, el mismo no perdió su naturaleza como parte integrante e indispensable de los negocios de que dependía la Mayagüez Shipping Terminal para su éxito económico como corporación de servicio público.

Parece que mucho antes de construirse el muelle, cierto señor de apellido Bravo abrió una carretera que cruzaba el canal en otro sitio por medio de un puente de madera y atravesaba las propiedades de Luisa Delgado y de José Romaguera. Antes de construirse el muelle Romaguera vendió a la Shell Oil Co. una parcela de terreno a condición de que la compradora construyera otro camino alrededor o junto a la propiedad así adquirida para ser usado en lugar de aquella parte del antiguo camino que atravesaba la finca de Romaguera. Así lo hizo la Shell Oil Co. El gerente de la Mayagüez Shipping Terminal declaró que sus terrenos se extendían hasta la línea divisoria de la finca de Romaguera y de la Shell, es decir, hasta el límite norte de la propiedad de la Shell. Luego de destruirse el puente construído por la Mayagüez Shipping Terminal el antiguo puente de madera fué reparado y fortalecido bajo la inspección de la Mayagüez Shipping Terminal, con dinero aportado por ella, por la Shell, por Romaguera y por la Mayagüez Light & Ice Co. Antes de hacerse esto, la Mayagüez Shipping Terminal, con el objeto de reabrir el antiguo camino, obtuvo permiso de Luisa Delgado para remover una cerca de alambre que ella había puesto a través de éste poco después de construirse el nuevo puente de la Mayagüez Shipping Terminal. Romaguera declaró que la carretera fabricada por la Shell Oil Co. estaba en la zona marítima. Hubo prueba tendiente a demostrar que un estribo del puente fabricado por la Mayagüez Shipping Terminal descansaba en parte de la carretera construída por la Shell Oil Co., o, como un testigo dijera, en el extremo de dicho camino. Romaguera declaró que "una esquina" de la carretera fué averiada o destruída cuando el puente fué derrumbado. De los autos que tenemos a la vista es imposible para el que no esté familiarizado con el lugar

imaginarse la situación relativa del muelle, de los dos puentes, de la carretera construída por la Shell Oil Co. y de la propiedad que la demandada tenía arrendada en la zona marítima. El juez de distrito estaba en mejor posición que este tribunal lo está ahora para apreciar la prueba en su totalidad.

Un ingeniero allí residente, a cargo de todas las carreteras y puentes insulares en el distrito de Mayagüez, declaró que el puente construído por la Mayagüez Shipping Terminal no había estado nunca a su cargo o bajo su inspección y control. Su declaración en cuanto al control e inspección del trozo de carretera entre un punto cercano al puente y la carretera autorizada por la resolución conjunta, no es lo bastante clara. No obstante, dice que luego de la desaparición del puente, él no colocó ninguna señal de peligro o aviso al público en aquel punto porque él nada tenía que ver con el puente. El estuvo igualmente seguro de que no había ejercido inspección o control sobre parte alguna de la carretera que está entre el puente y el muelle. No existe base satisfactoria para concluir que ni el puente construído por la Mayagüez Shipping Terminal unos diez u once meses antes de su derrumbamiento ni el trozo de carretera construído por la Shell Oil Co. en la zona marítima, primordialmente para su propio uso y el de su vendedor, Romaguera, habían pasado del dominio, inspección y control de la constructora, por consagración al servicio público o en alguna otra forma, al dominio, inspección y control del Gobierno Insular o al dominio, inspección y control del municipio de Mayagüez. Si el terreno adquirido por la Mayagüez Shipping Terminal de Luisa Delgado estaba o no dentro de aquella parte de la zona marítima poseída por la Mayagüez Shipping Terminal bajo el contrato de arrendamiento celebrado con El Pueblo de Puerto Rico, si el ramal construído sobre el terreno adquirido de Luisa Delgado era o no el ramal de no menos de seis metros de ancho que a la demandada se requería mantuviera a través de la zona arrendada como vía de comunicación con el litoral,

si la actuación del alcalde al facilitar la compra del terreno de Luisa Delgado era o no meramente "accidental" y extraoficial, y si el uso público del ramal situado entre un punto como a cinco metros del puente y el trozo de carretera autorizado por la resolución conjunta de 1929 creó o no alguna responsabilidad por parte de El Pueblo de Puerto Rico o por parte del municipio, no eran cuestiones decisivas. El accidente no ocurrió en ninguna parte del trozo de carretera últimamente mencionado. En lo que al uso público del puente se refiere, la cuestión no era tanto si el referido uso creó una responsabilidad por parte del Gobierno Insular o por parte del municipio, como si tal uso exoneró a la demandada de responsabilidad con motivo del accidente.

Los otros señalamientos son al efecto de que la corte de distrito cometió error: al resolver que en Puerto Rico no tiene aplicación la teoría de la consagración al servicio público y que solamente pueden considerarse como caminos públicos municipales los que hayan sido abiertos cumpliendo con las disposiciones de la ley municipal, y como carreteras públicas las que hayan sido incorporadas por acción legislativa al plan general de la ley de carreteras de 8 de marzo de 1906 (Comp. 2312–2325); al no declarar que el accidente tuvo lugar por negligencia de la demandante y de la persona que guiaba el vehículo ocupado por ella en el momento del accidente; al considerar la declaración del Dr. Frank O. Rivera como corroborante de los hechos alegados por la demandante; al declarar con lugar la demanda y especialmente al conceder la totalidad de la reclamación y condenar a la demandada al pago de las costas.

En vista de las conclusiones a que ya hemos llegado, no es necesario que resolvamos ahora el límite hasta el cual es aplicable en esta jurisdicción la doctrina de consagración al servicio público. La prueba dejó de demostrar la existencia de negligencia contribuyente por parte de la demandante o por parte del conductor. La declaración del Dr. Rivera corroboró, en parte por lo menos, la de la demandante. No ha-

llamos base satisfactoria para modificar la sentencia en lo que a la cuantía de la misma y al abuso de discreción al conceder las costas se refiere.

*La sentencia apelada debe ser confirmada.*

Los Jueces Asociados Señores Wolf y Córdova Dávila no intervinieron.